**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 10, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BAKHTIYOR JUMAEV,

    Defendant - Appellant.

No. 18-1296
(D.C. No. 1:12-CR-00033-JLK-2)
(D. Colo.)

_____

**ORDER**

_____

Before **MATHESON**, **LUCERO**, and **EID**, Circuit Judges.

_____

This matter is before the court on motion by Appellant's counsel, Caleb Kruckenberg, to correct a clerical error in the opinion issued December 8, 2021. The opinion incorrectly identified Appellant's counsel.

Upon consideration, the motion is granted. A correction version of the opinion issued on December 8, 2021, is attached and shall be issued nunc pro tunc to the original filing date.

Entered for the Court
CHRISTOPHER M. WOLPERT, Clerk

by: Jane K. Castro
    Chief Deputy Clerk

FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**December 8, 2021**

**Christopher M. Wolpert
Clerk of Court**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

BAKHTIYOR JUMAEV,

     Defendant - Appellant.

No. 18-1296

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CR-00033-JLK-2)**

_____

Caleb Kruckenberg, Washington, D.C., for Defendant-Appellant.

James C. Murphy, Assistant United States Attorney, Denver, Colorado (John C. Demers, Assistant Attorney General, National Security Division, U.S. Department of Justice, Washington, D.C.; Joseph Palmer and Steven L. Lane, Attorneys, National Security Division, U.S. Department of Justice, Washington, D.C.; Jason R. Dunn, United States Attorney, Denver, Colorado, with him on the briefs), for Plaintiff-Appellee.

_____

Before **MATHESON**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **EID**, Circuit Judge.

_____

**EID**, Circuit Judge.

_____

Defendant-appellant Bakhtiyor Jumaev and his co-defendant Jamshid

Muhtorov were convicted, after separate trials, of conspiring to provide material

support or resources to a designated foreign terrorist organization, and knowingly providing or attempting to provide material support or resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.[1]  Both appealed, and, with the parties' consent, we procedurally consolidated the cases.  In an opinion issued concurrently with this one, we reject Muhtorov's claims, including his Sixth Amendment speedy trial claim, and affirm his convictions.  *Muhtorov*, slip op. at 1, 106–63.  In this decision, we address Jumaev's claims, of which there are three.  First, like Muhtorov, Jumaev asserts that his Sixth Amendment speedy trial right was violated.  Second, Jumaev maintains that the district court abused its discretion by declining to severely sanction the government for its discovery conduct.  Third, Jumaev contends that the extraterritorial search warrants for his home, phone, and computer were issued in violation of Rule 41 of the Federal Rules of Criminal Procedure.  Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that each of Jumaev's claims fails, and we affirm.

**I**

**A**

Jumaev is a refugee from Uzbekistan.  In 2009, he met Muhtorov, a fellow Uzbekistan refugee.  The two lived far apart—Jumaev, in Philadelphia, Pennsylvania, and Muhtorov in Denver, Colorado.  But Philadelphia, it turned out, was one of the

---

[1] Muhtorov was also convicted on a third count not brought against Jumaev. *See United States v. Muhtorov*, No. 18-1366, slip op. at 1, 3, 115 (10th Cir. Dec. 8, 2021).

few cities in the United States where a trucking class was offered in Russian, and Muhtorov, who struggled with English but spoke Russian, wished to obtain a commercial trucker's license. Muhtorov decided to take the class in Philadelphia, and a mutual friend arranged for Muhtorov to stay with Jumaev while Muhtorov was there.

Jumaev and Muhtorov became friendly during Muhtorov's visit. The two had similar backgrounds. Both had left Uzbekistan due to government brutality, and both were Muslim. They also shared a mutual interest in the Islamic Jihad Union ("IJU"), a State Department–designated foreign terrorist organization with ties to al-Qaeda. After Muhtorov returned to Colorado, the two men stayed in contact.

Unbeknownst to Jumaev and Muhtorov, the government was intercepting their communications. Through warrantless surveillance of a non–United States person living abroad conducted pursuant to section 702 of the Foreign Intelligence Surveillance Act of 1978 Amendments Act of 2008 ("Section 702"), Pub. L. No. 110-261, 122 Stat. 2436 (codified at 50 U.S.C. § 1881a), the government had become aware that Muhtorov was connected to the IJU. Once Muhtorov was on the government's radar, the government used communications intercepted via Section 702 to support applications to surveil Muhtorov under the Foreign Intelligence Surveillance Act of 1978 ("FISA" or "traditional FISA"), Pub. L. No. 95-511, 92 Stat. 1783. The government also obtained information via traditional FISA surveillance that was eventually used against Jumaev.

3

In the course of surveilling Jumaev and Muhtorov, the government discovered that the men wished to provide money to the IJU for the "wedding," a code word that referred to the Jihadist cause. Specifically, they contemplated that Jumaev would send $300 to Muhtorov as a "wedding gift," and that Muhtorov would then give the money to the IJU.

Bank records show that a $300 check dated on or about March 10, 2011 was made out to Muhtorov by a known associate of Jumaev, Ilkhom Sobirov. On January 21, 2012, Muhtorov was arrested at Chicago O'Hare International Airport. He had on him a one-way ticket to Turkey, nearly $3,000 in cash, two new iPhones, and a new iPad.

**B**

On March 14, 2012, Jumaev was charged, via a criminal complaint filed in the District of Colorado, with conspiring to provide material support or resources to a designated foreign terrorist organization. That same day, a magistrate judge in the District of Colorado issued an arrest warrant for Jumaev and extraterritorial search-and-seizure warrants for Jumaev's home, cellular phone, and laptop computer in Philadelphia. Incriminating material was found on Jumaev's devices, and Jumaev was promptly arrested and detained pending trial. On March 20, 2012, a superseding indictment, charging both Jumaev and Muhtorov, added a second count as to Jumaev alleging that he knowingly provided or attempted to provide material support or resources to a designated foreign terrorist organization. On March 22, 2012, a second superseding indictment was returned, which deleted Jumaev's and

4

Muhtorov's aliases from the indictment caption but was otherwise identical to the first superseding indictment. From the filing of the first superseding indictment onward, Jumaev's and Muhtorov's cases proceeded largely in tandem, with the two filing numerous joint motions and objections addressing discovery, scheduling, and other matters.

The pretrial proceedings over the next six years were complicated and protracted. Discovery, in particular, proved to be a bottleneck. Jumaev and Muhtorov together broadly requested (1) all statements they had made that were in the government's possession, by which they meant "not just the statements made or given to government investigators or agents, but also all recorded conversations or communications including e mails and other written communications that they [were] alleged to have authored, as well as any statements made to third parties in whatever form," App'x Vol. I at 463; (2) "any transcriptions or summaries of any such statements and translations into English thereof," *id.*; (3) grand jury materials; and (4) exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The resulting discovery was voluminous, and, because many of the materials were classified, the government had to initiate numerous *ex parte*, *in camera* hearings pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3, to determine whether otherwise discoverable classified material could be withheld from the defense. Additionally, the government had acquired a large number of recordings of Jumaev and Muhtorov

speaking in Uzbek, Tajik, and Russian, and translating those materials was difficult because Uzbek and Tajik translators with security clearances were scarce.

On October 25, 2013, the government provided Muhtorov, but not Jumaev, notice that it would offer evidence at Muhtorov's trial that was obtained or derived from surveillance conducted pursuant to Section 702. On January 29, 2014, Muhtorov moved to suppress the evidence that was obtained or derived from Section 702 surveillance. Before Muhtorov filed his motion, the government informed Jumaev that he was not an "aggrieved person" as to the Section 702 acquisitions at issue—which was critical information, because by statute only an "aggrieved person" is permitted to "move to suppress . . . evidence obtained or derived from . . . electronic surveillance" conducted pursuant to FISA, including Section 702. 50 U.S.C. § 1806(e); *see id.* § 1881e(a)(1) (deeming Section 702 surveillance to be "electronic surveillance" that falls within the scope of 50 U.S.C. § 1806(e)). Notwithstanding the fact that the government told him he had not been "aggrieved," Jumaev joined Muhtorov's motion.

The district court denied the joint motion on November 19, 2015, nearly two years after it was filed. With respect to Muhtorov, the district court resolved the motion on the merits in the government's favor. But with respect to Jumaev, the district court concluded, consistent with the representation the government had made to Jumaev before he joined Muhtorov's motion, that Jumaev was not an "aggrieved

6

person" under 50 U.S.C. § 1806(e) and thus he could not seek suppression of Section 702 evidence nor bring an as-applied challenge to the constitutionality of the statute.[2]

On May 18, 2016, the government filed a third superseding indictment. The third superseding indictment added two new charges—counts 5 and 6—against Jumaev and Muhtorov for conspiring to provide personnel to a designated foreign terrorist organization knowing or intending that the personnel be used to prepare for or carry out a conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country. The government maintained that Jumaev and Muhtorov had attempted to help Jumaev's son study at a madrassa with ties to terrorism.

Eventually, the district court set a discovery deadline of September 1, 2016 and a trial date of March 13, 2017 for both Jumaev and Muhtorov. On the date of the discovery deadline, the government produced a hard drive containing approximately 39,000 files of recorded statements. This did not, however, prove to be the end of discovery. In fact, discovery productions continued well after the discovery deadline—though subsequent productions were much smaller than the one that occurred on September 1, 2016.

On October 17, 2016, Muhtorov filed a motion to sever his trial from Jumaev's. A little over a month later, the district court granted the motion. *United*

---

[2] To the extent Jumaev presented a facial challenge, it was resolved by the district court's rejection of Muhtorov's as-applied and facial challenges. *See* App'x Vol. III at 119; *see also Muhtorov*, slip op. at 22 n.11 (noting that because Muhtorov's as-applied Section 702 challenge fails, his "facial challenge necessarily fails" as well).

*States v. Muhtorov*, No. 12-cr-33-JLK, 2016 WL 11612426, at \*1–2 (D. Colo. Nov. 29, 2016).  The district court found the severance to be appropriate because Muhtorov anticipated he might call Jumaev as a witness.  *Id.* at \*1.  It also concluded that the need for separate, simultaneous translators for the different languages used in Muhtorov's and Jumaev's statements would make a joint trial cumbersome.  *Id.* at \*2.  Muhtorov's trial was moved back to July 31, 2017, but Jumaev's trial remained scheduled to begin on March 13, 2017.  Despite the severance, many aspects of the pretrial proceedings remained joined.

On November 4, 2016, Jumaev moved to suppress the evidence derived from the searches of his home, phone, and computer.  He asserted that the magistrate judge violated Federal Rule of Criminal Procedure 41 when she issued the extraterritorial warrants pursuant to which the evidence was obtained.  On January 31, 2017, the district court denied Jumaev's motion to suppress.

On February 28, 2017, less than two weeks before Jumaev's trial was set to begin, Jumaev moved for the first time to dismiss the indictment on the grounds that his Sixth Amendment right to a speedy trial had been violated.  Jumaev argued that the five years he had spent waiting to go to trial were excessive and the fault of the government.  Additionally, he maintained that the large quantity of discovery produced on the discovery deadline, the additional productions made after the deadline, and the government's decision to bring two new charges (counts 5 and 6) against him more than four years after he was first indicted had prevented his defense team from being ready to go trial on the scheduled date.

8

On March 1, 2017, the government voluntarily dismissed counts 5 and 6—the counts that had been added by the third superseding indictment. On March 13, 2017—the day that was meant to be the start of trial—the district court denied Jumaev's speedy trial motion. At the same time though, the district court sanctioned the government for its delayed filing and dismissal of counts 5 and 6. Specifically, the district court entered an order prohibiting the government from using any evidence pertaining to counts 5 and 6 in its case in chief. Jumaev then moved for a continuance to give his lawyers additional time to prepare his defense. The district court granted the motion and rescheduled the trial for January 8, 2018.

On November 30, 2017, the district judge informed the parties that he unexpectedly needed to undergo medical treatment. To accommodate this development, Jumaev's trial start date was moved again, this time to March 12, 2018.

On February 16, 2018, a few weeks before the new trial start date, Jumaev moved a second time to dismiss the indictment on speedy trial grounds. The district court again denied Jumaev's motion. Also in February 2018, the government finally made its last discovery production to Jumaev.

On March 2, 2018, the district court sanctioned the government for discovery conduct that had occurred in December 2017. That month, Jumaev's defense team traveled to Kazakhstan to depose a witness, Sobirov, who had acted as a confidential human source for the government. The government, however, failed to disclose potential impeachment information about Sobirov until the morning of his deposition. The district court determined that the timing of the government's disclosure

9

prevented Jumaev's defense team from being able to effectively use the potential impeachment information during Sobirov's deposition.  Accordingly, the district court ordered that the jury be read an instruction concerning "the information that was belatedly disclosed by the government and not elicited during [the] deposition." App'x Vol. VII at 406.

Jumaev's trial began on March 12, 2018.  On April 30, 2018—a little over six years after Jumaev was initially arrested and charged—Jumaev was convicted on both of the remaining counts against him (counts 1 and 2).[3]  On July 18, 2018, the district court sentenced Jumaev to time served—76 months and 3 days—as well as ten years of supervised release.[4]  Jumaev now appeals.

## II

We begin with Jumaev's Sixth Amendment speedy trial claim.  "The Sixth Amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'"  *United States v. Medina*, 918 F.3d 774, 779 (10th Cir. 2019) (alteration in original) (quoting U.S. Const. amend. VI).  To evaluate whether a defendant's Sixth Amendment speedy trial right has been violated, we

---

[3] Counts 3 and 4 pertained solely to Muhtorov.

[4] Jumaev was released into the custody of the U.S. Department of Homeland Security.  The government seeks to remove Jumaev from the United States, and on January 12, 2021, the Board of Immigration Appeals entered a final order of removal. Jumaev, though, has challenged that order in a separate appeal.  *See Jumaev v. Garland*, No. 21-9513 (10th Cir. filed Feb. 2, 2021).  On May 14, 2021, this court issued a stay of removal.  Order, *Jumaev*, No. 21-9513 (May 14, 2021).  Jumaev's immigration appeal otherwise remains pending.

apply the four-part balancing test set forth by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). "The four factors are: '(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.'" *Medina*, 918 F.3d at 780 (quoting *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006)). "We review the legal question of whether there was a Sixth Amendment violation de novo and any underlying district court factual findings for clear error." *United States v. Frias*, 893 F.3d 1268, 1272 (10th Cir. 2018).

Although six years is an exceptionally long time to await trial, Jumaev's claim lacks merit in this instance. As noted above, we conclude in our separate *Muhtorov* opinion that Muhtorov's speedy trial claim fails. And that conclusion resolves Jumaev's claim, too. In all critical respects, Jumaev's claim is substantially similar, and often identical, to Muhtorov's. In fact, as we detail below, to the extent Jumaev's claim differs from Muhtorov's, the material differences render Jumaev's claim the weaker one. Accordingly, for largely the same reasons that Muhtorov's claim falls short, we determine that Jumaev's Sixth Amendment speedy trial claim likewise fails.[5]

We first weigh each of the *Barker* factors. We then balance them.

---

[5] The dissent's primary criticisms of our speedy trial analysis here are the same as those lodged against our speedy trial analysis in *Muhtorov*. *See* Dissent at 1 (dissenting "[f]or the reasons stated in" the *Muhtorov* dissent and "incorporat[ing] that dissent in its entirety"). As we detail in *Muhtorov*, we respectfully disagree with those objections.

**A**

**1**

The first *Barker* factor—the length of the delay—weighs strongly in Jumaev's favor. This first factor "typically serves as a gatekeeper." *Frias*, 893 F.3d at 1272. "We examine the other factors only when the delay is presumptively prejudicial, satisfied by '[d]elays approaching one year.'" *Id.* (alteration in original) (quoting *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006)). "The delay period starts with the indictment or arrest, whichever comes first." *United States v. Nixon*, 919 F.3d 1265, 1269 (10th Cir. 2019). It ends "upon conviction." *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016).

If a defendant can show that the delay is presumptively prejudicial, we must then "decide how much weight to assign this delay, considering the length of time and the complexity of the federal case." *Nixon*, 919 F.3d at 1270. In making this assessment, we consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett v. United States*, 505 U.S. 647, 652 (1992). Unsurprisingly, "[t]he greater the delay, the more th[is] factor favors the defendant." *United States v. Hicks*, 779 F.3d 1163, 1168 (10th Cir. 2015).

Here, the roughly six-year delay "is well beyond the one-year delay that courts have deemed sufficient to clear the 'gate' and allow consideration of the remaining three *Barker* factors." *Muhtorov*, slip op. at 116. And while it is shorter than the six and a half years that Jumaev's co-defendant Muhtorov spent waiting for trial, it is

12

still longer than delays that we have concluded favor the defendant at the first *Barker* factor. *See Batie*, 433 F.3d at 1290–91 (17-month delay); *United States v. Margheim*, 770 F.3d 1312, 1326 (10th Cir. 2014) (23-month delay); *United States v. Seltzer*, 595 F.3d 1170, 1176–77 (10th Cir. 2010) (two-year delay); *Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004) (four-and-one-third-year delay). Accordingly, "when considered 'as one factor among several,'" this six-year delay "weighs strongly in favor of [Jumaev]." *Muhtorov*, slip op. at 117 (quoting *Seltzer*, 595 F.3d at 1176).

Our conclusion is not altered by the fact that a long delay can be justified for a "serious, complex . . . charge." *Barker*, 407 U.S. at 531. As we observe in *Muhtorov*, "[t]his consideration cuts in different directions in [these] case[s]." Slip op. at 117. "On the one hand, the investigation included traditional FISA . . . , which created procedural complexities." *Id.* But on the other, the underlying conduct was straightforward, particularly in Jumaev's case. The government itself stressed this point during trial, explaining to the jury that "this [was] a simple case" concerning a single transaction in which Jumaev "sent $300 to a man named Jamshid Muhtorov" "knowing that Jamshid Muhtorov was going to go support a terrorist group called the Islamic Jihad Union." App'x Vol. XVIII at 598–99, 2662. In the end, we need not resolve this tension. Even assuming that this case was "complex" for purposes of the first *Barker* factor, a six-year delay is still so long that the first *Barker* factor weighs strongly in favor of finding a constitutional violation in this case. *See Muhtorov*, slip op. at 118 (reaching the same conclusion with respect to Muhtorov's delay of six and a half years).

13

**2**

The second *Barker* factor—the reason for the delay—does not weigh in favor of a speedy trial violation. "Because the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner the burden is on the prosecution to explain the cause of the pre-trial delay." *Muhtorov*, slip op. at 119 (internal quotation marks omitted) (quoting *United States v. Brown*, 169 F.3d 344, 349 (6th Cir. 1999)). In turn, delays can count in favor of a speedy trial violation even when "there is no evidence that the government intentionally delayed the case for the explicit purpose of gaining some advantage." *Seltzer*, 595 F.3d at 1179. However, "pretrial delay is often both inevitable and wholly justifiable," such as when "[t]he government . . . need[s] time to collect witnesses against the accused [and to] oppose his pretrial motions." *Doggett*, 505 U.S. at 656.

As we explain in *Muhtorov*, the delay in these cases was due to discovery, which lasted for Jumaev until February 2018. *See Muhtorov*, slip op. at 127 & n.62.[6]

---

[6] As noted above, toward the end of 2017, the district judge alerted counsel that he unexpectedly needed to undergo medical treatment, and, as a result, Jumaev's trial was moved from January 2018 to March 2018. App'x Vol. IV at 832, Vol. XIII at 1080. For the same reason, Muhtorov's trial was similarly moved, from March 2018 to May 2018. *Muhtorov*, slip op. at 127. Because the government completed discovery in Muhtorov's case in January 2018—four months before Muhtorov's trial occurred—we consider the delay caused by the district judge's medical treatment in the course of assessing Muhtorov's speedy trial claim. *See id.* at 127, 136–38. But with respect to Jumaev, discovery was completed later than in Muhtorov's case and trial occurred sooner—just one month after the government finished its discovery productions. As a result, delays due to discovery productions eclipsed the delay due to the district judge's medical treatment, eliminating the need to address the district judge's medical situation as part of our analysis of Jumaev's claim.

The government, therefore, must "provide an acceptable rationale for the delay." *Seltzer*, 595 F.3d at 1177. This is no easy task in light of the considerable length of the delay. But, ultimately, the government has carried its burden. "Given the volume of materials requested, meeting those requests required time, particularly when the materials had to be translated from uncommon languages—Uzbek and Tajik—by translators with security clearances," who were few and far between. *Muhtorov*, slip op. at 131. Additionally, "[t]he district court's and the parties' obligations to comply with CIPA significantly complicated the discovery process" in ways that were unavoidable. *Id.* at 129. For these reasons, the lengthy period of discovery was justified.[7]

---

The dissent's approach differs slightly from ours here. It reasons that "[b]ut for . . . government-caused delay, the trial would have begun in March 2017," and "therefore [the dissent] would attribute the entire additional year's delay [from March 2017 to March 2018] to the government," including the "additional two months until March 2018 due to the district court judge's illness." Dissent at 3 n.3. In our view, these different paths lead to the same destination, for, like the dissent, we count the entire period from March 2017 to March 2018 as delay that the government must justify. However, unlike the dissent, our basis for reaching this conclusion is that discovery was not completed until February 2018, making an earlier trial impossible. The dissent's analysis does not necessarily conflict with our own—indeed, in *Muhtorov* we *do* weigh the delay caused by the judge's medical treatment against the government, albeit not heavily. *See* slip op. at 136–38. But in this case we do not, at the end of the day, reach the issue of the judge's illness.

[7] As we detail in section III, *infra*, Jumaev asserts that the government violated its discovery obligations in this case by (1) failing to meet the September 1, 2016 discovery deadline; (2) bringing new charges against him late into the proceedings, which forced his defense team to revisit and reevaluate the discovery that had been produced up until that point; and (3) delaying the disclosure of potential impeachment information concerning a witness, Sobirov, until the morning of that witness's deposition. *See* Reply Br. at 27–28. Although Muhtorov does not also raise these claims on appeal, they do not render Jumaev's case dissimilar from

15

The dissent takes issue with this analysis. Most of its disagreements concern the reasoning we employ in *Muhtorov*, *see* Dissent at 2–3 & n.2, and we address those critiques in that opinion. But the dissent also posits, with respect to Jumaev specifically, that "[t]he excessive governmental delay in responding to timely discovery requests made by . . . Jumaev is even more compelling [than in Muhtorov's case] because the government waited to provide discovery information long in its possession until the eve of Jumaev's first scheduled trial," "caus[ing] an additional delay of one year." *Id.* at 1. It thus concludes that "the second <u>Barker</u> factor" should "weigh[] even more heavily in Jumaev's favor than," in the dissent's view, "it did for Muhtorov." *Id.* at 4.

For three reasons, we are unconvinced that Jumaev's case is stronger than Muhtorov's when it comes to the second *Barker* factor. First, the dissent's argument appears to be premised on the notion that the March 2017 postponement of Jumaev's trial was solely the result of discovery "produced [by the government] for the first

_____

Muhtorov's for purposes of the second *Barker* factor. Jumaev's claim concerning the government's failure to meet the discovery deadline is simply a recasting of Jumaev and Muhtorov's general complaints about the slow pace of discovery. Similarly, the late-filed charges included in the third superseding indictment were brought against Jumaev as well as Muhtorov, *see* App'x Vol. III at 262–63, so any time lost due to that development affected them both, *see Muhtorov*, slip op. at 139 (explaining that "Muhtorov would not have 'faced trial . . . earlier than he did but for' the . . . filing and dismissing of the third superseding indictment" "[g]iven that the discovery process happened before, during, and after [that] event[]" (first omission in original) (quoting *Doggett*, 505 U.S. at 657)). Finally, while the late disclosure of potential impeachment information about Sobirov is an issue unique to Jumaev, that late disclosure had no impact on Jumaev's trial date, and therefore is not relevant to our assessment of the second *Barker* factor.

time shortly before trial." *Id.* at 3.  The dissent believes, apparently, that we should look favorably on Jumaev because until he received the government's "eleventh-hour" disclosures, he believed he would be able to proceed to trial on the March 2017 date.  *Id.*  Yet the dissent's factual premise does not hold.  As Jumaev himself explained in his first speedy trial motion, "[g]iven the huge number of intercepted communications provided on September 1, 2016, the Jumaev defense ha[d] not [as of March 2017] had the time or resources to review these communications [with Jumaev and an interpreter], let alone know which ones need[ed] to be translated for the preparation of transcripts for trial."  App'x Vol. VI at 703.  Accordingly, Jumaev would not have been ready to go to trial on the initial start date even absent the government's productions after September 1, 2016, for his defense team was still working through the communications that had been produced by the discovery deadline.  Second, the dissent's argument similarly lacks support in the law.  We are unaware of any authority that suggests the constitutional import of a pretrial delay increases when it occurs close to a scheduled trial date.  Third, given that Muhtorov's trial date was pushed back at the same time as Jumaev's and for the same amount of time, we fail to see how the delay is more "compelling" in Jumaev's case.  If anything, Muhtorov's situation was the more compelling one, for by that point Muhtorov had already spent roughly two months longer than Jumaev in pretrial detention, and the order of Jumaev's and Muhtorov's trials guaranteed that Muhtorov would have to wait longer still for a jury to hear his case.

17

In sum, while the delay in this case was due to discovery, the government has justified the delay.  The second *Barker* factor therefore weighs against finding a constitutional violation.

### 3

### a

The third *Barker* factor—Jumaev's assertion of his right to a speedy trial— also weighs against a speedy trial violation.  "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right."  *Barker*, 407 U.S. at 531–32.  "[F]ailure to assert the right," on the other hand, "will make it difficult for a defendant to prove that he was denied a speedy trial."  *Id.* at 532.  Though a defendant bears the burden to assert his right, a defendant does not "waive[] any consideration of his right to speedy trial for any period prior to which he has not demanded a trial."  *Id.* at 525.  Rather, "the ultimate inquiry is 'whether the defendant's behavior during the course of litigation evinces a desire to go to trial with dispatch.'"  *Muhtorov*, slip op. at 142 (quoting *Batie*, 433 F.3d at 1291).  Thus, "'[w]e may weigh the frequency and force of [the defendant's] objections' to the delay."  *Margheim*, 770 F.3d at 1328 (first alteration in original) (quoting *United States v. Latimer*, 511 F.2d 498, 501 (10th Cir. 1975)). "A defendant's early and persistent assertion of his right to a speedy trial will tip the third factor in his favor, but efforts to stall the proceedings, such as 'moving for many continuances,' will 'tip the balance of this factor heavily against the

18

defendant.'"  *Medina*, 918 F.3d at 781 (internal quotation marks omitted) (quoting *Margheim*, 770 F.3d at 1328).

Jumaev argues that the motions to dismiss he filed in the trial court sufficiently asserted his constitutional right to a speedy trial.  We determine otherwise, for Jumaev's motions were not timely.  The first was submitted on February 28, 2017, less than two weeks before the then-scheduled trial date of March 13, 2017.  The second was filed on February 16, 2018, less than a month before his trial finally did occur and about five years and eleven months after he was arrested and charged.  We have previously recognized that the third *Barker* factor weighs against a defendant who chooses "not to assert his right to a speedy trial until trial itself [is] imminent." *United States v. Kalady*, 941 F.2d 1090, 1095 (10th Cir. 1991).  And we find that that principle applies here.  By waiting until just thirteen days before trial was set to begin to raise his first speedy trial objection, Jumaev tipped this factor in the government's favor.

Notably, Jumaev's requests for a speedy trial differ from those of his co-defendant Muhtorov, who did adequately assert his speedy trial right.  While both Muhtorov and Jumaev waited years to file their first speedy trial motions, Muhtorov's motions were more frequent and more timely.  For instance, Muhtorov, like Jumaev, filed two counseled motions.  But, unlike Jumaev, Muhtorov *also* submitted several pro se motions in which he "expressed his frustration with delays." *Muhtorov*, slip op. at 143.  The first of these, in particular, included an analysis of the four *Barker* factors and was filed five months before Muhtorov's then–trial date.  *See*

19

*id.* at 143–45.  Muhtorov's counseled motions, too, stand in contrast to Jumaev's.

For example, Muhtorov's first counseled motion was filed approximately four

months prior to trial instead of only two weeks beforehand.  *See id.* at 143, 145.

Muhtorov's persistence and diligence show that he "did not intend on waiting until

the eve of trial to assert the right for the first time."  *Id.* at 145.  Jumaev's tardiness,

by contrast, leaves open the possibility that he "merely . . . mov[ed] to dismiss after

the delay ha[d] already occurred."  *United States v. Gould*, 672 F.3d 930, 938 (10th

Cir. 2012) (internal quotation marks omitted) (quoting *Batie*, 433 F.3d at 1291).

In reaching this conclusion, we recognize that when these cases began, the

government believed—and represented—that discovery would be completed within

months, not years.  *See* App'x Vol. XI at 228.  A full appreciation for the difficulties

that discovery would present developed only gradually, and for that reason, Jumaev

and Muhtorov's failure to register speedy trial objections closer to the start of the

proceedings is understandable.  *See Barker*, 407 U.S. at 528 (instructing that a

defendant is not obligated to submit a "pro forma demand [for a speedy trial] . . .

immediately after appointment of counsel" to preserve his right).  Indeed, this context

helps explain why Muhtorov's assertion of his speedy trial right was sufficient

despite the late date on which it was lodged; in an ordinary case, a speedy trial

objection first raised roughly five years after the indictment would be untimely.  *See*

*Nixon*, 919 F.3d at 1272 (determining that the third *Barker* factor weighed against a

defendant who "waited almost a year to invoke his right to a speedy trial"); *United*

*States v. Black*, 830 F.3d 1099, 1121 (10th Cir. 2016) (suggesting that an initial

20

assertion of the speedy trial right "13 months after the First Superseding Indictment" is "late"); *United States v. Koerber*, 10 F.4th 1083, 1110 (10th Cir. 2021) (finding that a first assertion of the speedy trial right "over four years after [the defendant's] initial indictment" was not "'frequent' or 'forceful'"). But this context does not justify the entirety of Jumaev's delay. It was ultimately Jumaev's "burden to actively assert his right." *Yehling*, 456 F.3d at 1244; *see also Muhtorov*, slip op. at 140 ("The defendant has the 'burden of showing he desired a speedy trial.'") (quoting *Gould*, 672 F.3d at 938). And Jumaev has not demonstrated that the government's unexpected discovery delays prevented him from asserting his speedy trial right until trial was virtually at hand.

Focusing on the number of motions he filed, Jumaev insists that he did meet his burden. He observes that he objected on speedy trial grounds on two separate occasions. Reply Br. at 15. And, citing our decision in *United States v. Seltzer*, he says that "this Court has held that if a defendant has 'twice asserted his speedy trial rights' this 'put[s] both the district court and the government on notice that the defendant wishe[s] to proceed to a prompt resolution of his case,' and thus 'weighs strongly' in his favor." *Id.* (alterations in original) (quoting *Seltzer*, 595 F.3d at 1179).

Jumaev overreads *Seltzer*. *Seltzer*'s analysis did not turn solely on the number of motions filed; such a rule would permit a defendant to prevail on this factor simply by "rapid-fire filing [speedy trial] motions" shortly before trial. *Margheim*, 770 F.3d at 1329; *see also Batie*, 433 F.3d at 1291 (explaining that a speedy trial motion

21

submitted after "delay has already occurred" "could be, indeed may well be, strategic"). Rather, *Seltzer* held that the third *Barker* factor weighs in the defendant's favor when his speedy trial requests are "repeated" *and* "prompt." *Seltzer*, 595 F.3d at 1179. Applying that principle here, although "both [Jumaev] and the *Seltzer* defendant 'brought . . . repeated requests,' . . . only the *Seltzer* defendant did so *promptly*." *Margheim*, 770 F.3d at 1329 (first omission and emphasis in original) (quoting *Seltzer*, 595 F.3d at 1179). Jumaev's two motions, therefore, did not sufficiently assert his speedy trial right.

Finally, Jumaev's other pretrial conduct casts further doubt on his claim that he prioritized a speedy trial. *See United States v. Tranakos*, 911 F.2d 1422, 1429 (10th Cir. 1990) (explaining that the third *Barker* factor weighs against a defendant who "moves for dismissal on speedy trial grounds" but whose "other conduct indicates a contrary desire"). Jumaev points out that he objected to the slow pace of the government's discovery efforts throughout the proceedings, which is true. But more revealing is Jumaev's decision to join Muhtorov's motion seeking suppression of evidence acquired pursuant to Section 702. This was an issue of significant novelty and complexity, and it was clear that the issue would take a substantial period of time to litigate. For instance, one filing Jumaev and Muhtorov submitted in support of the motion—a notice of supplemental authority—was 420 pages long. *See* App'x Vol. II at 53–472. Moreover, Jumaev knew that his chances of prevailing on the motion were close to zero. After all, the government informed Jumaev two months before he joined Muhtorov's motion that he was not an "aggrieved person" as

22

to the Section 702 acquisitions at issue. *Id.* Vol. I at 605, 608. And the district court corroborated this claim—while further indicating that Jumaev likely lacked standing to bring the Section 702 challenge—at a hearing that took place when the joint motion was pending. *Id.* Vol. XI at 266–67. Today, Jumaev acknowledges that "the case against [him] had virtually nothing to do with FISA." Reply Br. at 13.[8] Nevertheless, Jumaev insisted on litigating the Section 702 issue. That choice reveals that he was not "focused completely on proceeding to trial." *Margheim*, 770 F.3d at 1329.[9]

Based on the foregoing, we conclude that Jumaev did not adequately assert his speedy trial right.[10]

---

[8] In keeping with this acknowledgment, Jumaev has not appealed the denial of the Section 702 suppression motion. Muhtorov, though, has appealed that ruling, and we address it in the opinion dedicated to his claims. *See Muhtorov*, slip op. at 6–75.

[9] The dissent maintains that "Jumaev's decision to join Muhtorov's . . . suppression motion in 2014 did not evidence Jumaev's lack of eagerness to go to trial" because "Jumaev and Muhtorov remained as co-defendants in a single trial until the November 2016 severance," and therefore, "regardless of whether he joined the motion, [Jumaev] could not progress toward trial until the motion was decided in November 2015." Dissent at 7 n.7. The dissent never explains, however, why Jumaev could not have asked for a severance once it became clear that Muhtorov's case would require resolution of the complicated issues surrounding Section 702 surveillance. Indeed, when Muhtorov asked for a severance, it was granted. *See Muhtorov*, 2016 WL 11612426, at *1–2.

[10] In addition to the foregoing analysis, we note that (1) Jumaev did not object to a number of continuances requested by the government under the Speedy Trial Act ("STA"), 18 U.S.C. §§ 3161–3174, *see* App'x Vol. I at 489, 491, 529, 542, 548, and (2) Jumaev himself requested a nine-month continuance on March 13, 2017, the date his trial was initially scheduled to occur, *see id.* Vol. XVIII at 86, 90. We do not, however, count these continuances against Jumaev. Just as in *Muhtorov*, once Jumaev committed himself to litigating the Section 702 issue his "failure to object [to STA continuances] sooner was understandable in light of [the] pending motions to

23

**b**

For four principal reasons, the dissent disagrees with our analysis of the third *Barker* factor. Though we understand the dissent's frustration with the length of time it took for Jumaev's case to get to trial, we are unpersuaded by the dissent's arguments.

First, the dissent contends that by "tip[ping] this factor in favor of Muhtorov because his . . . pro se motions expressed frustration with the delay" but not granting equal credit to Jumaev, we "require counseled defendants to file pro se motions in order for <u>Barker</u>'s assertion-of-the-right factor to weigh in their favor." Dissent at 6. Not so. We contrast Jumaev's motions with Muhtorov's to illustrate why, despite the many similarities between their cases, Jumaev's assertions of the right fell short even as Muhtorov's successfully crossed the third-*Barker*-factor threshold. But what matters for purposes of this comparison is not that some of Muhtorov's motions were pro se. What matters is that Muhtorov's motions—regardless of whether they were counseled or pro se—were more frequent and more timely than Jumaev's. *See Medina*, 918 F.3d at 781 (explaining that "[a] defendant's early and persistent assertion of his right to a speedy trial will tip the third [*Barker*] factor in his favor").

---

suppress." Slip op. at 146 (explaining that "[i]t may have been pointless for [Muhtorov] to object to the STA continuances given the pending suppression motions"). As for Jumaev's own motion for a continuance, he filed it only after his first speedy trial motion was denied, and he maintained that the continuance was necessary, in part, due to the government's ongoing document productions. *See* App'x Vol. XVIII at 85–86. Given that the government did continue to produce discovery well after March 13, 2017, we agree that Jumaev's request for a continuance did not necessarily run counter to a desire to proceed to trial quickly.

24

To treat Jumaev's and Muhtorov's assertions as equivalent when conducting this analysis would be to essentially ignore Muhtorov's pro se motions—something that the dissent acknowledges we cannot do.  *See* Dissent at 6 (recognizing that "Barker's third factor requires us to consider the . . . additional pro se motions for a speedy trial filed by Muhtorov").  Thus, accounting for Muhtorov's pro se motions when we weigh Jumaev's and Muhtorov's objections, the conclusion that Muhtorov's were made with greater "frequency and force," *Margheim*, 770 F.3d at 1328 (quoting *Latimer*, 511 F.2d at 501), is inescapable.[11]

Second, the dissent criticizes us for not "weigh[ing] the conduct of *both* parties."  Dissent at 8 (emphasis added).  In its view, because "the government repeatedly assured [Jumaev] that discovery would be forthcoming," Jumaev did all that was required of him when "[h]e waited on the government to fulfill its responsibilities, diligently and persistently filing discovery motions that were not met in a timely fashion."  *Id.* at 8–9.[12]  Our analysis is not blind to the government's conduct.  As our discussion in the preceding section makes clear, we have factored

_____

[11] The dissent also claims that our analysis, at the very least, "penalize[s] Jumaev by faulting him for not augmenting the motions filed by his counsel with pro se motions."  Dissent at 6.  This, again, is an inaccurate representation of our reasoning.  We do not punish Jumaev for not filing pro se motions.  We simply adjudge that the two delinquent motions Jumaev did file were insufficient to tilt the third *Barker* factor in his favor.

[12] In expressing this opinion, the dissent says that "Jumaev did not seek continuances."  Dissent at 9.  That is not true.  As mentioned above, Jumaev did, in fact, ask for a nine-month continuance after his first speedy trial motion was denied.  *See supra* note 10.  But because we do not count this request against Jumaev, *see id.*, this discrepancy is immaterial.

the government's initial representations concerning discovery into our assessment of the timeliness of Jumaev's first speedy trial motion.  *See supra* section II.A.3.a.  But when all is said and done, the burden is on the defendant "to actively assert his right."  *Yehling*, 456 F.3d at 1244.  Consequently, even when delay is attributable to the government, the third *Barker* factor weighs against a defendant who "merely . . . mov[es] to dismiss after the delay has already occurred."  *Gould*, 672 F.3d at 938 (internal quotation marks omitted) (quoting *Batie*, 433 F.3d at 1291).  Nor is it enough for a defendant to complain about the pace of discovery without expressly raising a speedy trial objection.  As we note in *Muhtorov*, Jumaev and Muhtorov (and now, too, the dissent) "offer[] no authority that . . . objections to the slow pace of discovery productions are akin to the assertion of a speedy trial right."  Slip op. at 144 n.78.

Third, the dissent maintains that we act uncharitably toward Jumaev by "[s]imply comparing the time between filing of their first counseled speedy trial motions and Muhtorov and Jumaev's respective trial dates."  Dissent at 9.  It says that such a comparison "ignores that, after severance, Jumaev was required to proceed to trial first, before Muhtorov," and accordingly there was a "shorter practical window between the November 29, 2016 severance and the first scheduled trial date on March 13, 2017 available for Jumaev to assert his speedy trial right."  *Id.* This argument is without legal foundation.  Our caselaw instructs that there are two key periods we look to when assessing the timeliness of a defendant's assertion of the right: the time elapsed since indictment or arrest (whichever comes first), *see, e.g.*,

26

*Nixon*, 919 F.3d at 1272; *Black*, 830 F.3d at 1121, and the time left before trial, *see*

*Kalady*, 941 F.2d at 1095.  Nothing in our precedent suggests that we should alter

these measurements to account for a co-defendant's trial date.  Even if, however, we

were to make the adjustment the dissent calls for and use only Jumaev's initial trial

date when comparing Jumaev's and Muhtorov's first speedy trial objections, the

juxtaposition would still be unfavorable to Jumaev.  Muhtorov's initial motion was

submitted on February 1, 2017—roughly four weeks before Jumaev filed his first

motion, and nearly six weeks before Jumaev's trial was set to begin.  This contrast

illustrates, once again, that if Jumaev was committed to asserting his speedy trial

right, he had no reason to wait until a mere thirteen days prior to trial to start

objecting to the length of the proceedings.

Fourth, the dissent says we should not "fault Jumaev for joining Muhtorov's

motion to suppress § 702-derived evidence."  Dissent at 7 n.7.  It contends (1) that

the legality of the Section 702 surveillance was "a relevant issue in Jumaev's case"

because evidence to be used against Jumaev was, at bottom, the product of that

surveillance; (2) that "the government's assertion that Jumaev was not an 'aggrieved

person' entitled to notice . . . was open to good faith challenge by Jumaev below";

(3) that "the belated government assurances that Jumaev was not an 'aggrieved

person' were far from unequivocal, requiring several defense motions to gain a clear

articulation of the government's position"; (4) that "Jumaev's decision to join in

Muhtorov's motion . . . was far from a bad faith attempt to delay the trial"; and

(5) that "[t]o the extent . . . additional delay resulted from [Jumaev's] decision [to

27

join Muhtorov's motion], which it did not given that the cases were not severed until a year after the motion to suppress was decided, it should not be weighed heavily against Jumaev." *Id.* at 2, 7 n.7.

None of these arguments convinces us to overlook Jumaev's decision to join Muhtorov's motion. With respect to the dissent's first and second contentions that the Section 702 surveillance was relevant to Jumaev's case and open to good faith challenge, Jumaev himself has fatally undercut such claims. By Jumaev's own admission, "the case against [him] had virtually nothing to do with FISA." Reply Br. at 13. Similarly, Jumaev has taken the wind out of the sails of the dissent's third contention that the government's assurances that Jumaev was not "aggrieved" were "belated" and "equivocal." As Jumaev notes in his reply brief, "[t]he government . . . 'made clear to [his] counsel in 2013 that the [Section 702] Notice did not apply to him.'" *Id.* (quoting Aple. Br. at 26). And 2013 was certainly early enough to inform Jumaev's decision to join Muhtorov's motion, which was not filed until 2014. As for the dissent's fourth contention—concerning whether Jumaev made a bad faith attempt to delay the trial—this argument inverts the test we apply when weighing the third *Barker* factor. The question is not whether the defendant acted in bad faith to affirmatively slow down the proceedings; it is whether the defendant demonstrated that he wished to proceed to trial quickly. *See Batie*, 433 F.3d at 1291. And Jumaev has not made that showing. Finally, as for the dissent's fifth contention, we agree with the dissent that Jumaev's decision to join Muhtorov's motion did not produce additional delay. That delay would have occurred anyway due to the slow pace of

28

discovery.  *See supra* section II.A.2.  But Jumaev could not have known that such delay was inevitable at the time that he joined Muhtorov's motion.  Indeed, Jumaev himself states that early in the case he "believed the government's representations that discovery disclosures would be complete[d]" relatively quickly and that a trial would "follow[] closely thereafter."  Reply Br. at 19.  Thus, his decision to join Muhtorov's motion shows that he was more interested in litigating a complicated and tangential legal issue than in "go[ing] to trial with dispatch."  *Batie*, 433 F.3d at 1291.  And that "contrary desire" is what matters for purposes of the third *Barker* factor.  *Tranakos*, 911 F.2d at 1429.

In brief, Jumaev's long-delayed speedy trial motions were inadequate assertions of his speedy trial right.  The third *Barker* factor weighs in the government's favor.

**4**

Lastly, the fourth *Barker* factor—prejudice—weighs in Jumaev's favor, though only moderately.  "The individual claiming the Sixth Amendment violation has the burden of showing prejudice."  *Medina*, 918 F.3d at 781 (internal quotation marks omitted) (quoting *Seltzer*, 595 F.3d at 1179).  However, "[i]n cases of 'extreme' delay, the defendant need not present specific evidence of prejudice, but can rely on a 'presumption of prejudice' resulting from the prolonged delay."  *Id.* (quoting *United States v. Frater*, 495 F. App'x 878, 882 (10th Cir. 2012) (unpublished)).  "Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice."  *Seltzer*, 595 F.3d at 1180 n.3.  "Absent . . . an 'extreme' delay, the

defendant must provide specific evidence of how the delay was prejudicial." *Medina*, 918 F.3d at 781 (quoting *Margheim*, 770 F.3d at 1329). "[I]n assessing whether [the defendant] has alleged prejudice with sufficient particularity, we focus on the interests the speedy-trial right was designed to safeguard: (1) 'preventing oppressive pretrial incarceration'; (2) 'minimizing anxiety and concern of the accused'; and (3) 'limiting the possibility that the defense will be impaired.'" *Margheim*, 770 F.3d at 1329 (brackets omitted) (quoting *Barker*, 407 U.S. at 532).

"Based on our discussion of the second *Barker* factor, we cannot attribute six years of delay to the government." *Muhtorov*, slip op. at 152. Accordingly, this fourth factor turns on whether Jumaev has demonstrated specific prejudice. Jumaev attempts to do so by showing oppressive pretrial incarceration and impairment of his defense. We consider each in turn.

<strong>a</strong>

Jumaev has established that he suffered prejudice due to his pretrial incarceration. "Because the seriousness of a post-accusation delay worsens when the wait is accompanied by pretrial incarceration, oppressive pretrial incarceration is the second most important [interest]." *Jackson*, 390 F.3d at 1264. And as we recognize in *Muhtorov*, extended pretrial incarceration, on its own, can be prejudicial. *See Muhtorov*, slip op. at 153. That is the case here. Just as "the mere fact of [Muhtorov's] incarceration for six-and-a-half years weighs in favor of finding prejudice," so too do Jumaev's six years of pretrial incarceration support a prejudice

30

finding. *Id.* "By any measure, [six] years of pretrial incarceration is extraordinary." *Id.*

Additionally, Jumaev has shown that his pretrial incarceration was particularly oppressive because he spent that incarceration "in Denver, far from his friends in Pennsylvania," and during that time was "only . . . able to see one of his sons via videoconference for 10 minutes." Aplt. Br. at 57 (quoting Suppl. App'x (Pleadings) at 154). Like we do for Muhtorov, we credit Jumaev's claims. *Muhtorov*, slip op. at 153. "*Barker* itself noted that time in jail for a pretrial detainee can disrupt family life and thereby be prejudicial." *Id.* And the distance Jumaev was forced to spend away from his home in Philadelphia—over 1700 miles—undoubtedly exacerbated the isolation caused by his incarceration.

In two instances, however, Jumaev fails to show a nexus between his pretrial incarceration and the conditions that he claims were oppressive. He contends that he experienced prejudice because (1) Denver was particularly far away from his family in Uzbekistan and (2) he had to "live[] with the knowledge that his communications with his family and friends were monitored for an extended period of his life, such that his private concerns ha[d] become public." Aplt. Br. at 57–58 (second alteration in original) (internal quotation marks omitted) (quoting Suppl. App'x (Pleadings) at 154). Neither of these arguments withstands scrutiny. As for the first argument, Jumaev's theory appears to be that his pretrial imprisonment would have been less burdensome vis-à-vis his separation from his family in Uzbekistan had he been in Pennsylvania rather than Colorado. Yet given that Pennsylvania is still half a world

31

away from Jumaev's homeland, this proposition makes little sense. As for the second argument, Jumaev apparently references the fact that the government surveilled him while it was building its case. That surveillance, though, would have come to light regardless of whether Jumaev was incarcerated before trial. Therefore, the fact that Jumaev learned he was surveilled bears no relation to whether his pretrial incarceration was oppressive.

We are also unpersuaded by Jumaev's final argument concerning the oppressiveness of his pretrial incarceration. Jumaev maintains that his pretrial incarceration was oppressive because "it is likely that [he] would have received a . . . shorter . . . term of imprisonment" had he not been incarcerated before trial, given that "his time served was already near the top of his advisory guideline range by the time of sentencing." Reply Br. at 24. Observing that "[t]he Supreme Court has recognized that pretrial custody can be particularly oppressive when it involves 'dead time' in jails that 'offer little or no recreational or rehabilitative programs,'" he says that "[h]ad [he] gone to trial earlier, he likely would have spent less *total* time in custody that [sic] he did in *pretrial* custody." *Id.* at 25 (quoting *Barker*, 407 U.S. at 532–33).[13] This in turn, he continues, "suggests that the time in custody was particularly oppressive." *Id.*

---

[13] Although Jumaev references the principle that incarceration is more oppressive when it occurs in "local jails" that "lack . . . rehabilitation programs and visiting privileges," *Muhtorov*, slip op. at 154, he does not specifically claim that he spent time in such a place, and the record discloses that he was incarcerated at a federal facility—the Englewood Federal Detention Center—from March 30, 2012 through his release in 2018, *see, e.g.*, App'x Vol. VI at 695.

32

This argument carries no water. Jumaev cites no case that has treated the sentence imposed *post*-conviction as relevant to assessing the constitutional validity of *pre*trial proceedings. And even supposing a defendant's sentence can be a valid component of the speedy trial analysis in an appropriate case, Jumaev fails to present a compelling argument as to why the sentence imposed in this instance rendered the pretrial incarceration oppressive. Jumaev's period of pretrial detention—76 months and 3 days—fell within the applicable sentencing guidelines range of 63 to 78 months. Suppl. App'x (Pleadings) at 145. And although, practically speaking, the length of that pretrial incarceration prevented the district court from selecting a sentence on the low end of the relevant range, *see id.* at 158, it is not clear that, at bottom, Jumaev's pretrial detention was the reason he received a long sentence. After all, the district court said during the sentencing hearing that "[t]he crimes with which Mr. Jumaev has been convicted are undoubtedly grave and he must be sentenced accordingly"—reasoning that indicates a sentence on the high end of the guidelines range was on the table regardless of how much time Jumaev had already served. *Id.* at 153. In these circumstances, we cannot say that Jumaev's sentence of time served demonstrates that his pretrial incarceration was oppressive.

Notwithstanding the failures of some of Jumaev's arguments, on the whole, Jumaev has demonstrated prejudice due to the nature and length of his six years of pretrial incarceration.

**b**

Jumaev has also demonstrated prejudice due to impairment of his defense. "[T]he most serious [interest] is the 'hindrance of the defense' because the inability of a defendant to adequately prepare his case skews the fairness of the entire system." *Seltzer*, 595 F.3d at 1179–80 (quoting *United States v. Toombs*, 574 F.3d 1262, 1275 (10th Cir. 2009)).  "On this interest, we have held that a defendant should show 'that the delay resulted in the loss of specific evidence or the unavailability of certain witnesses.'" *Frias*, 893 F.3d at 1273 (quoting *Hicks*, 779 F.3d at 1169).  Impairment of the defense also occurs when "witnesses lose their memory of events that are critical to the theory of defense." *Margheim*, 770 F.3d at 1329.

To establish impairment from lost testimony, a defendant must make three showings.  First, the defendant must "state[] with particularity what . . . testimony would have been offered," *Jackson*, 390 F.3d at 1265 (alteration in original) (internal quotation marks omitted) (quoting *Tranakos*, 911 F.2d at 1429), and explain how the lost testimony was "material," *Margheim*, 770 F.3d at 1330, or "meaningful," *Medina*, 918 F.3d at 782.  Second, the defendant must "present evidence that the delay caused the . . . unavailability." *Jackson*, 390 F.3d at 1265.  Third, the defendant must establish that he "t[ook] steps, when possible, to preserve testimony." *Id.*  "But when a defendant is not 'on notice of the need to preserve testimony' or has no 'realistic opportunity to do so,'" we do not "view the failure to preserve testimony as fatal to a claim of prejudice." *Muhtorov*, slip op. at 150–51 (quoting *Jackson*, 390 F.3d at 1265).

Jumaev tries to demonstrate prejudice due to loss of testimony in two ways: the failure of his own memory, and the unavailability of his former roommate Jakhonghir Rakhimov as a witness. He succeeds in the latter attempt, but the weight of his showing is reduced because Rakhimov's testimony would not have been exculpatory or central to Jumaev's defense.

We first address Jumaev's assertion that his own recollection suffered from the passage of time. Jumaev says that because his memory failed, he was unable "to give context to the volumes of recorded conversations he had been a part of seven years prior to his trial." Reply Br. at 21. And he further claims that "[t]hese lapses in his memory were exploited by the government" at trial, used to show "that [his] explanations about his discussions with the FBI and Mr. Muhtorov were 'neither reliable nor credible.'" *Id.* at 22 (emphasis omitted) (quoting App'x Vol. XVIII at 2717).

We accept that Jumaev can satisfy the second and third impairment-of-the-defense requirements with respect to this lost testimony. We do not doubt that Jumaev's recollection of the relevant events faded, to at least some degree, over the long span of time at issue. *See Seltzer*, 595 F.3d at 1177 n.2 (noting "the dangers of memory loss or distortion over time"); *see also Edmaiston v. Neil*, 452 F.2d 494, 500 (6th Cir. 1971) (concluding that the defendant's "own memory was understandably vague with regard to events occurring eight and one-half years before trial"). Additionally, there is no indication that Jumaev had reason to know—at the outset, when his memory was still fresh—that the proceedings would last so long as to cause

his memory to falter, such that he needed to take steps to preserve his own testimony. Finally, even if Jumaev had anticipated that his memory would fail, preserving his testimony was not a realistic option: it would have been impractical for him to record every detail he could recall about every conversation he had ever had (1) with Muhtorov or (2) that pertained to the IJU. Accordingly, Jumaev has established that the delay here produced the loss of his testimony and that preservation was neither required nor feasible.

Jumaev falls short, however, in his attempt to show that the lost testimony was material. Jumaev does not assert prejudice on the grounds that his testimony would have been exculpatory. Instead, he claims that the government used his poor recollection against him "as evidence of his evasiveness," undermining his credibility with the jury. Aplt. Br. at 55. The record does not bear out Jumaev's characterization of the government's trial arguments. True, the prosecutor who made the government's closing statement contended that Jumaev "said plenty of things that are neither reliable nor credible." App'x Vol. XVIII at 2717. But she was likely referring to the fact that, by Jumaev's own admission, he had lied to the FBI on multiple occasions, not to the fact that Jumaev had struggled to remember certain details when he testified. *See id.* at 1879, 1882–83, 1887. Further, at that point in her closing, the prosecutor was not trying to cast doubt on Jumaev's testimony. To the contrary, she was trying to convince the jury that, despite the lies Jumaev had previously told to the FBI, incriminating statements he made to the FBI after he was arrested *were* credible. *See id.* at 2710–13, 2717. Jumaev thus fails to show that the

36

government used his lack of recollection against him. Ergo, he has not demonstrated that he was prejudiced by the loss of his own testimony.

Turning to Jumaev's argument about the unavailability of Rakhimov, we conclude that Jumaev fares better on this score. The government does not contest that the march of time rendered Rakhimov—who could not be located for Jumaev's trial—unavailable as a witness. Nor does the government maintain that Jumaev had notice that he needed to attempt to preserve Rakhimov's testimony. The sole question, then, is whether Jumaev has pointed to particular testimony from Rakhimov that would have been material to Jumaev's case.

Jumaev has done so. Relying on an interview of Rakhimov conducted by the FBI, he shows that, had Rakhimov been available, Rakhimov would have testified that Jumaev "was a simple primitive man who did not understand Islam." Aplt. Br. at 56 (internal quotation marks omitted) (quoting App'x Vol. V at 37). And this testimony, Jumaev further explains, could have cast doubt on the government's claim that Jumaev was serious about joining Muhtorov in the pursuit of religious extremism. *Id.*; *see* App'x Vol. XVIII at 2707–09. Thus, Rakhimov's testimony "arguably 'would have aided [Jumaev's] defense,'" rendering it material. *Muhtorov*, slip op. at 156 (quoting *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998)).

That said, "we do not weigh this prejudice heavily" because Rakhimov's testimony "would not have been exculpatory or central to the defense." *Id.* at 158. Rakhimov's testimony would not have directly contradicted the government's theory

37

that Jumaev was radicalized; the jury could have determined that Jumaev turned to religious extremism even though he "did not understand Islam." Moreover, the actions charged in the indictment occurred in 2011 and 2012, while Rakhimov was Jumaev's roommate only until 2008. App'x Vol. V at 37. The jury, therefore, could have concluded that in the years after Rakhimov lived with Jumaev, Jumaev's understanding of Islam grew. Indeed, lending support to such a conclusion, Rakhimov himself would have testified that Jumaev "was teaching himself" about Islam using "videos and . . . tapes" and by "listening to sermons from . . . Anwar Aulaqi," a well-known cleric who had been "'blacklisted' by the United States." *Id.* In short, even though Rakhimov's testimony was material, it was neither exculpatory nor central to his defense. For that reason, we do not find this prejudice substantial.

**B**

We now turn to balancing the *Barker* factors, but given the substantial similarities between this case and Muhtorov's, we need not belabor the analysis. The first, second, and fourth *Barker* factors carry essentially the same weights here that they carry in *Muhtorov*. In both cases, (a) the first *Barker* factor weighs heavily in favor of finding a constitutional violation because a delay of six years or more is substantial, (b) the second *Barker* factor does not weigh in favor of a violation because the government has justified the discovery delay, and (c) the fourth factor weighs in favor of a violation due to the oppressive pretrial incarceration and the loss of a witness, though does not weigh as heavily as it would had the witness's testimony been exculpatory or central to the defense. *Muhtorov*, slip op. at 158. The

38

only significant difference between these cases is that for Jumaev, the third factor—

assertion of the right to a speedy trial—weighs against finding a violation. *Muhtorov*

makes clear that even if the third factor tipped toward a constitutional violation,

Jumaev's claim would not succeed "given the quantity and nature of the discovery,

and the overall good faith and diligence of the government and the district court in

bringing this case to trial." *Id.* at 162–63. *A fortiori*, with the third factor weighing

against Jumaev, his speedy trial claim fails.

### III

We next consider Jumaev's discovery-sanctions claim.[14] "We review a district

court's decision to impose sanctions, and the court's choice of sanction, for an abuse

of discretion." *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002).

Jumaev maintains that the government "violated the court's discovery orders

in two ways." Reply Br. at 27. First, he says that "[t]he government undoubtedly

---

[14] In his opening brief, Jumaev appeared to raise, in addition to the argument
we consider here, an argument that the government failed to timely fulfill its
obligations under *Brady v. Maryland*. *See* Aplt. Br. at 59 ("The court erred in
declining to impose sufficient sanctions for the government's repeated violations of
its *Brady* obligations and the court's discovery orders."). In his reply brief, however,
Jumaev clarifies that he does not "argu[e] a constitutional violation based on the late
disclosure of *Brady* material." Reply Br. at 27. Rather, he argues only "that the
district court erred by declining to impose sufficient sanctions for discovery
violations." *Id.* Because Jumaev has "intentionally relinquished" his *Brady*
argument, we do not address it. *Folks v. State Farm Mut. Auto. Ins. Co.*, 784 F.3d
730, 737 (10th Cir. 2015) (internal quotation marks omitted) (quoting *Richison v.
Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011)); *see also United States v.
Augustine*, 742 F.3d 1258, 1264 n.1 (10th Cir. 2014) (declining to consider
arguments that were "abandoned . . . in [the] reply brief").

39

disregarded the September 1, 2016, discovery deadline imposed by the court." *Id.*

Yet rather than, as Jumaev argues the district court should have done, penalize the

government for this conduct, the district court granted a nine-month continuance.

*See id.* at 27–28; App'x Vol. XVIII at 86, 90.[15]  Second, Jumaev observes that "the

trial court twice sanctioned the government for" its discovery conduct.  Reply Br. at

28 (emphasis omitted) (citing App'x Vol. VII at 406, Vol. XVIII at 82–83).  The first

sanction was issued after the district found that the government "caused the defense

team to have to revisit and reevaluate all of the discovery that had been provided to it

by the Government" by waiting over four years after the initial indictment to bring

two new charges against Jumaev (count 5 and count 6).  App'x Vol. XVIII at 83.  As

remedies for the government's conduct, the district court granted the aforementioned

continuance (which served multiple functions), as well as entered "[a]n order of

preclusion . . . prevent[ing] the Government from offering any of the Count 5 and 6

evidence in its possession in its case in chief." *Id.*  The second sanction was issued

when the district court determined that the government "disturbed the balance

between the parties" by waiting to disclose potential impeachment information about

a witness, Sobirov, until the morning of the witness's deposition in Kazakhstan.

App'x Vol. VII at 406.  The district court corrected this imbalance by "instruct[ing]

---

[15] Jumaev moved for this continuance because he needed more time to review discovery produced by the September 1, 2016 deadline.  *See supra* notes 10, 12.  He also did so, though, because (among other reasons) the government produced discovery after the September 1, 2016 deadline.  *See id.*  Hence, we agree with Jumaev that the continuance was, in part, a means of addressing the government's post-deadline discovery production.

the jury on the information that was belatedly disclosed by the government and not elicited during Mr. Sobirov's deposition." *Id.* The question Jumaev presents on appeal is whether the district court's choice of remedies in these three instances was an abuse of discretion.[16]

Under Rule 16(d)(2) of the Federal Rules of Criminal Procedure, a district court has broad discretion in choosing a sanction upon determining that a party has violated a discovery obligation. "[T]he court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). When selecting the sanction, a

---

[16] The government contends that Jumaev "has not shown any discovery order . . . violations," Aple. Br. at 19, a claim that appears to be premised on the fact that, although the government was sanctioned for its discovery conduct, it was not sanctioned for violating an *order* of the district court pertaining to discovery. While the government's assertion is partially correct as a factual matter, the government offers a distinction without a difference. The government is subject to discovery obligations in a criminal case regardless of whether the district court issues discovery orders, and the district court's authority to order sanctions for late compliance with discovery obligations—as well as our review of such an order—is unaffected by the source of the discovery obligation that was violated. *See* Fed. R. Crim. P. 16(d)(2) (authorizing a district court to issue sanctions for violations of the discovery obligations imposed by Rule 16 of the Federal Rules of Criminal Procedure, including those obligations created by a district court order issued pursuant to Rule 16(d)(1)); *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009) (indicating that district courts have authority under Rule 16 to remedy belated disclosures that violate *Brady* rather than Rule 16 itself); *United States v. Gonzales*, 164 F.3d 1285, 1291–92 (10th Cir. 1999) (observing that "[e]ven where Rule 16 is inapplicable, the courts have discretion to exclude evidence as a sanction for violation of a discovery order," *id.* at 1291, and employing the same legal standard used in Rule 16 cases).

district court considers the factors we first announced in *United States v. Wicker*,

848 F.2d 1059 (10th Cir. 1988): "(1) the reasons the government delayed producing

the requested materials, including whether or not the government acted in bad faith

when it failed to comply with the discovery [obligation]; (2) the extent of prejudice

to the defendant as a result of the government's delay; and (3) the feasibility of

curing the prejudice with a continuance." *Id.* at 1061. "[T]hese three factors,"

however, "should merely guide the district court in its consideration of sanctions;

they are not intended to dictate the bounds of the court's discretion." *Id.*

Although the choice of sanction is committed to the district court's discretion,

we have instructed that "[t]he court should impose the least severe sanction that will

accomplish prompt and full compliance with" the violated discovery requirement.

*Gonzales*, 164 F.3d at 1292. "The preferred sanction is a continuance." *Golyansky*,

291 F.3d at 1249. "It would be a rare case where, absent bad faith, a district court

should exclude evidence rather than continue the proceedings." *Id.*

Here, "the government acted diligently and without bad faith or negligence."

*Muhtorov*, slip op. at 118.[17] Accordingly, to establish that the district court abused

---

[17] This observation from *Muhtorov* concerns the overall pace of discovery, and thus applies here only to the government's failure to complete discovery by the September 1, 2016 deadline. But we similarly find no evidence of bad faith concerning the filing of the third superseding indictment and the delayed disclosure of potential impeachment information about Sobirov. Jumaev points to only one possible instance of bad faith related to either of these events: that in response to Jumaev's motion to have Sobirov—an immigrant who had left the country after serving as a confidential human source for the government—paroled into the United States to testify at Jumaev's trial, the government asserted that the motion should be denied "because there was no way of knowing whether [Sobirov] would leave

its discretion by declining to impose more severe sanctions, Jumaev must

demonstrate (1) prejudice to his defense (2) that the district court's sanctions did not

cure. *See Golyansky*, 291 F.3d at 1249.[18]  Jumaev fails to make such a showing.

We start with prejudice.  Jumaev contends that "[t]he prejudice [he] suffered

was, primarily, the extreme delay" caused by the belated discovery productions.

Aplt. Br. at 64.  He does not claim that this delay caused "prejudice as it relates to

guilt or innocence."  Reply Br. at 28.  But, pointing to a Sixth Amendment speedy

trial case, he says that "prejudice can come in the form of delay itself."  *Id.* (citing

*Doggett*, 505 U.S. at 657).

Jumaev's attempt to show that delay itself constitutes prejudice comes up

short.  Although Jumaev is correct that delay itself can be prejudicial for purposes of

---

willingly after the trial."  App'x Vol. VII at 405; *see* Aplt. Br. at 62, 64.  The district
court determined that "[t]his representation by the government was not forthright and
bordered on deceitful," given that the government "had previously granted Mr.
Sobirov deferred action and Significant Public Benefit Parole so that he could remain
in the U.S."  App'x Vol. VII at 405.

While the government's misrepresentation is troubling, in this appeal Jumaev
does not take issue with the fact that Sobirov was unavailable to testify at Jumaev's
trial.  And critically, Jumaev never explains how the government's lack of candor in
opposing his motion to have Sobirov paroled into the United States demonstrates that
the timing of its disclosure of potential impeachment information about Sobirov was
the product of bad faith.  Indeed, any connection between the motion and the delayed
disclosure is tenuous at best given that, a month before Sobirov's deposition, the
government dropped its opposition to permitting Sobirov to enter the United States to
testify.  *See id.* at 332.  Jumaev thus has not established that the discovery violations
at issue were the product of bad faith.

[18] We have also indicated that, absent prejudice, a district court may suppress
evidence that did not comply with discovery orders when doing so is necessary "to
maintain the integrity and schedule of the court."  *Wicker*, 848 F.2d at 1061.  Jumaev
does not argue that such circumstances were presented in this case.

a constitutional speedy trial claim, *see, e.g.*, *Frias*, 893 F.3d at 1272 (noting that when assessing the first *Barker* factor, delay "is presumptively prejudicial" if it "'approach[es] one year'" (quoting *Batie*, 433 F.3d at 1290)), "prejudice" means different things in different legal contexts. For instance, even in the speedy trial context, the prejudice analysis differs depending on which *Barker* factor is under consideration. *See Muhtorov*, slip op. at 148 n.81. So too, the *Wicker* prejudice analysis is its own inquiry. Specifically, when applying the *Wicker* prejudice factor, we ask whether "the delay impacted the defendant's ability *to prepare or present its case*." *Golyansky*, 291 F.3d at 1250 (emphasis added). Delay, therefore, is relevant to assessing prejudice under *Wicker* only to the extent that delay impaired the defendant's ability to mount his defense.

Jumaev makes no effort to show such impairment here. As discussed *supra* in section II.A.4.b., Jumaev argues as part of his speedy trial claim that the time his case took to get to trial (1) impaired his ability to recall important details when he testified and (2) rendered a witness who would have testified on his behalf, Rakhimov, unavailable. But Jumaev does not present these arguments in support of this discovery-sanctions claim. Nor is it clear that he could have made such arguments here—the delay at issue for this discovery-violation claim is not the entire pretrial period, but just the time from the September 1, 2016 discovery deadline until the government made its final production to Jumaev in February 2018. Consequently, Jumaev has not demonstrated that he suffered *Wicker* prejudice due to delay.

This is not to say that Jumaev suffered no prejudice. To the contrary, the late discovery productions and the belated superseding indictment caused Jumaev's defense team to need more time to prepare for trial. *See Golyansky*, 291 F.3d at 1250 (explaining that late productions can cause "unfair surprise"). And the last-minute disclosure of potential impeachment information about Sobirov prevented Jumaev's defense team from being able to effectively use that information during Sobirov's deposition. But it is only these harms—not "delay itself"—that the district court's orders needed to address.

With these harms in mind, we turn to whether the district court's sanctions cured the prejudice to Jumaev's defense, and we conclude that the district court crafted adequate remedies. First, to ensure that Jumaev's defense team was able to review discovery materials produced after September 1, 2016, as well as to make up for time that Jumaev's defense team had spent revisiting evidence after the filing of the third superseding indictment, the district court granted a continuance. App'x Vol. XVIII at 86, 90. Second, to prevent the late-filed charges from creating further additional work for the defense team, the district court forbade the government from using any evidence associated with counts 5 and 6 in its case in chief, even in support of the other counts. *Id.* at 83–84.[19] Third, to make up for the defense team's inability

---

[19] Prohibiting the use of such evidence in support of the other counts is what gave this part of the district court's order its teeth, as by the time the court was ready to rule on this discovery issue, the government had voluntarily dismissed counts 5 and 6. *See* App'x Vol. XVIII at 83.

45

to use potential impeachment evidence during Sobirov's deposition in Kazakhstan, the district court "instruct[ed] the jury on the information that was belatedly disclosed by the government and not elicited during Mr. Sobirov's deposition." *Id.* Vol. VII at 406. These orders redressed the prejudice caused by the government's delays and in turn were a proper exercise of the district court's discretion.

Focusing on the continuance remedy, Jumaev protests that the continuance actually "made [things] worse" because by that point he had already suffered through years of pretrial delays. Aplt. Br. at 64. In this respect, Jumaev is correct that a district court must keep a defendant's right to a speedy trial in mind when determining whether a continuance is an appropriate sanction for a discovery violation. *See United States v. Yepa*, 608 F. App'x 672, 680 (10th Cir. 2015) (unpublished) (determining that the district court acted within its discretion in deciding that a continuance was not a feasible sanction because a continuance would have "inequitably extend[ed] [the defendant's] pretrial incarceration"); *United States v. Ivory*, 131 F. App'x 628, 631 (10th Cir. 2005) (unpublished) (upholding the district court's decision to order a continuance as a discovery sanction when doing so "would solve the problem with respect to [the defendant] *without* impairing his speedy trial rights" (emphasis added)).[20] But here, for the reasons stated *supra* in section II,

---

[20] Unpublished cases cited in this opinion are not binding precedent, but we consider them for their persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A), (C).

Jumaev's speedy trial right was not violated.  It follows, then, that Jumaev's speedy trial right did not render a continuance an inappropriate sanction in this instance.

To summarize, although the slow pace of discovery, the late-filed charges, and a last-minute disclosure of potential impeachment information caused Jumaev some prejudice, the district court's orders were sufficiently curative.  The remedy that Jumaev most strongly objects to—the continuance—was not only within the district court's discretion to order, but is generally the preferred method for dealing with discovery violations.  Accordingly, Jumaev's challenge to the district court's choice of discovery sanctions fails.

**IV**

Finally, we turn to Jumaev's claim that the evidence obtained from the execution of extraterritorial search warrants for his home, cellular phone, and laptop computer should have been suppressed.  In considering Jumaev's challenge to the district court's denial of his suppression motion, we review the district court's legal determinations de novo and its factual findings for clear error, viewing the evidence in the light most favorable to the government.  *United States v. Trujillo*, 993 F.3d 859, 864 (10th Cir. 2021).

The search warrants at issue were authorized by a federal magistrate judge, a federal judicial officer whose power to issue warrants is geographically constrained.  As relevant here, Federal Rule of Criminal Procedure 41 "generally limits a federal magistrate judge's warrant-issuing authority to the district where he or she sits." *United States v. Krueger*, 809 F.3d 1109, 1110–11 (10th Cir. 2015); *see* Fed. R.

47

Crim. P. 41(b)(1) ("[A] magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the district . . . .").[21]  This general limitation, however, is subject to exceptions.  *See* 28 U.S.C. § 636(a) (indicating that a federal magistrate judge has powers outside of "the district in which" he or she sits "as authorized by law"). Here, the government invokes the exception found in Federal Rule of Criminal Procedure 41(b)(3), which provides that "a magistrate judge—in an investigation of domestic terrorism or international terrorism—with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district."  Fed. R. Crim. P. 41(b)(3); *see also* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107-56, § 219, 115 Stat. 272, 291 (inserting Rule 41(b)(3) into the Federal Rules of Criminal Procedure).  Because Federal Rule of Criminal Procedure 41(b) is entitled "Venue for a Warrant Application," we refer to Rule 41(b)(3)'s requirement that there be a connection between the magistrate judge's district and the terrorism activities under investigation as a "venue requirement."

Jumaev does not dispute that the investigation into his conspiracy with Muhtorov to provide material support to the IJU was an investigation of domestic or

---

[21] There are also statutory limits on a magistrate judge's authority.  *See* 28 U.S.C. § 636(a); *see also Krueger*, 809 F.3d at 1117–18 (Gorsuch, J., concurring in the judgment) (emphasizing the importance of these statutory limits).

international terrorism sufficient to trigger Rule 41(b)(3).  Nor does he contest that

"activities related to the terrorism" occurred within the District of Colorado, the

judicial district in which the magistrate judge who issued the warrants sat.  Instead,

his argument is a procedural one concerning the sufficiency of the warrant

application materials that were submitted to the magistrate judge.  *See* Aplt. Br. at 68.

He contends that the materials "were deficient because they failed to attest to a single

fact showing *any* connection to Colorado."  *Id.*  Due to this alleged failure to

"present[] information to the magistrate demonstrating that she had statutory

authority to issue the warrants," Reply Br. at 29, Jumaev argues that the magistrate

judge's issuance of the warrants violated Rule 41, and that in turn the evidence

obtained via those warrants must be suppressed, *see* Aplt. Br. at 68–69.[22]

    Jumaev's argument founders because it is not supported by the text of Rule 41.

No provision of Rule 41 mandates that an application for a Rule 41(b)(3) warrant

---

[22] We assess whether a Rule 41 violation justifies suppression using the
analytical framework this court adopted in *United States v. Pennington*, 635 F.2d
1387 (10th Cir. 1980).  "Under this framework, we begin by considering whether
Rule 41 was in fact violated." *Krueger*, 809 F.3d at 1113.  "If so, we typically
proceed by determining whether that specific Rule 41 violation rises to the level of a
Fourth Amendment violation." *Id.*  "If we determine that the Rule 41 violation is *not*
of constitutional import, we then consider whether the defendant can establish that, as
a result of the Rule violation, '(1) there was "prejudice" in the sense that the search
might not have occurred or would not have been so abrasive if the Rule had been
followed, or (2) there is evidence of intentional and deliberate disregard of a
provision in the Rule.'" *Id.* at 1114 (quoting *Pennington*, 635 F.2d at 1390).

    Because we conclude that Rule 41 was not violated, we resolve this case at the
first step of the *Pennington* analysis.  Further, for the same reason, we do not address
the government's alternative argument that the good faith exception to the
exclusionary rule applies.

address 41(b)(3)'s venue requirement.  The only reference to the 41(b)(3) venue

requirement is found in Rule 41(b) itself, a part of Rule 41 that other circuits have

recognized "is a substantive provision," not one that "detail[s] the procedures for

obtaining and issuing warrants."  *United States v. Berkos*, 543 F.3d 392, 397–98

(7th Cir. 2008) (emphasis omitted); *see also United States v. Ackies*, 918 F.3d 190,

201 (1st Cir. 2019) (adopting the Seventh Circuit's view).  By contrast, the part of

Rule 41 that does speak to the procedure for obtaining a search-and-seizure

warrant—Rule 41(d)—points to just one thing that must be shown in a search-and-

seizure warrant's application materials: "probable cause to search for and seize a

person or property."  Fed. R. Crim. P. 41(d)(1) ("After receiving an affidavit or other

information, a magistrate judge . . . *must* issue the warrant if there is probable cause

to search for and seize a person or property . . . ." (emphasis added)).  Given that this

is the only application requirement identified in the rule, it follows that an

application's omission of information pertaining to the 41(b)(3) venue requirement is

not a Rule 41 violation.  "After all, 'common sense, reflected in the canon *expressio*

*unius est exclusio alterius*, suggests that the specification of [one requirement]

implies' the exclusion of others."  *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ.*

*of Okla.*, 693 F.3d 1303, 1312 (10th Cir. 2012) (Gorsuch, J.) (brackets omitted)

(quoting *Arizona v. United States*, 567 U.S. 387, 432 (2012) (Scalia, J., concurring in

part and dissenting in part)); *see also Keene Corp. v. United States*, 508 U.S. 200,

50

208 (1993) (noting that courts have a "duty to refrain from reading a phrase into [a] statute when Congress has left it out").[23]

Although we determine that Rule 41 does not obligate the government to address the 41(b)(3) venue requirement in its warrant application materials, we do not go so far today as to hold that a magistrate judge may issue an extraterritorial warrant pursuant to Rule 41(b)(3) without having *any* basis for concluding that activities related to the terrorism under investigation may have occurred in her district, so long as the government could have showed such a connection at the time the warrant was issued. We need not decide that question, because in this case the magistrate judge was given the information she needed to determine that relevant terrorism activities had occurred in Colorado. To start, the warrant application materials here may have been enough on their own to allow the magistrate judge to discern the Colorado connection, for in support of the warrant applications the government submitted an affidavit that detailed at length Jumaev's interactions with Muhtorov, and Muhtorov had already been indicted on a terrorism charge in the District of Colorado. *See* App'x Vol. I at 217, Vol. VI at 52–70. But even if the application materials themselves failed to establish the link to Colorado, the government provided more: it also filed a criminal complaint against Jumaev that alleged he had "conspire[d]" "with others" "*in the county of Denver in the State and*

---

[23] Rule 41 also lays down requirements as to what must be in a warrant. *See* Fed. R. Crim. P. 41(e)(2) ("Contents of the Warrant"). Again, information about venue is not among those requirements. *See id.*

*District of Colorado.*" *Id.* Vol. VI at 50–51 (emphasis added). The warrant

applications, the affidavit, and the criminal complaint were clearly intended to be

considered as a single package; in fact, the affidavit pulled double duty, expressly

supporting both the warrant applications and the complaint. *Id.* at 52. And together,

these submissions allowed the magistrate judge to discern that at least some of the

numerous terrorism-related activities described in the affidavit had occurred in

Colorado. No more was necessary.

Jumaev argues that this analysis conflicts with the Supreme Court's decision in

*Whiteley v. Warden*, 401 U.S. 560 (1971). There, the Court held that "an otherwise

insufficient affidavit cannot be rehabilitated by testimony concerning information

possessed by the affiant when he sought the warrant but not disclosed to the issuing

magistrate," because "[a] contrary rule would . . . render the warrant requirements of

the Fourth Amendment meaningless." *Id.* at 565 n.8. Extending this logic, Jumaev

contends that to permit the government to rely on a criminal complaint to help satisfy

the 41(b)(3) venue requirement would be to sanction the very type of "rehabilitation"

that *Whiteley* forbids. *See* Reply Br. at 31–32.

Jumaev's reliance on *Whiteley* misses the mark. The government here did not

try to supplement its warrant affidavit after realizing that the affidavit was deficient.

Rather, the government submitted the complaint that referenced Colorado *alongside*

the affidavit and the applications. Further, *Whiteley* concerned the probable-cause

requirement imposed by the Fourth Amendment, *see* 401 U.S. at 564–65, not a venue

52

requirement listed in a rule of procedure. *Whiteley*, therefore, is easily distinguished from the case at hand.

Jumaev nevertheless insists that the "reasoning behind" *Whiteley* is "in play here." Reply Br. at 31–32. He says that "the magistrate must be informed of some of the underlying circumstances"; "otherwise, the inferences from the facts which lead to the complaint will be drawn not by a neutral and detached magistrate, as the Constitution requires, but instead, by a police officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 32 (brackets and internal quotation marks omitted) (quoting *Aguilar v. Texas*, 378 U.S. 108, 114–15 (1964)). Jumaev again ignores that this reasoning concerned the process by which the government establishes *probable cause*—something that the Constitution identifies as essential to the issuance of a warrant. *See* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ."). The process a magistrate judge must use to determine that the government has satisfied a venue provision found in rules of criminal procedure, by contrast, is a subject about which the Fourth Amendment has nothing to say. *Whiteley*'s reasoning thus has no application in this case.

In sum, no provision of Rule 41 demands that Rule 41(b)(3)'s venue requirement be addressed in the warrant application materials. And even assuming without deciding that a magistrate judge must have a basis for concluding that Rule 41(b)(3)'s venue requirement is satisfied before issuing a 41(b)(3) warrant, we conclude that the magistrate judge had such a basis here. Thus, the extraterritorial

search warrants for Jumaev's home, cellular phone, and laptop computer did not

violate Rule 41.

**V**

For the foregoing reasons, we AFFIRM Jumaev's convictions and the district

court's judgment.

18-1296, United States v. Jumaev
**LUCERO**, Senior Judge, dissenting.

For the reasons stated in my dissent in the companion case of co-defendant Jamshid Muhtorov, I respectfully dissent from the decision not to vacate Bakhtiyor Jumaev's conviction for want of a speedy trial.[1] See United States v. Muhtorov, No. 18-1366, slip op. at 1-24 (10th Cir. Dec. 8, 2021) (Lucero, Senior J., dissenting) (hereinafter "Muhtorov dissent"). I incorporate that dissent in its entirety herein. The excessive governmental delay in responding to timely discovery requests made by defendant Bakhtiyor Jumaev is even more compelling because the government waited to provide discovery information long in its possession until the eve of Jumaev's first scheduled trial. This caused an additional delay of one year. Such delay is attributable to the government under the Barker factors discussed in my earlier dissent. Barker v. Wingo, 407 U.S. 514 (1972). As in that dissent, the government has failed to show that the delays resulting from its discretionary decisions were necessary. See United States v. Seltzer, 595 F.3d 1170, 1178 (10th Cir. 2010).

**I**

Jumaev was indicted for conspiring with Muhtorov to provide material support to a designated terrorist organization and for knowingly providing such support. From their indictments in 2012 to the severing of their cases on November 29, 2016, Jumaev and

---

[1] Jumaev also contends that the district court abused its discretion by declining to severely sanction the government for its discovery violations and that the extraterritorial search warrants issued in his case violated Rule 41. (Op. at 2.) Because I would vacate his conviction on the basis of a speedy trial violation, I do not address these contentions.

1

Muhtorov were fused together as defendants in a joint trial. As a result, the government's decisions on § 702 notice, discovery production, and CIPA procedures directly affected both defendants, because absent severance, one could not go to trial without the other. Adding to their conjoined destiny, the evidence against Jumaev was directly derived from the traditional FISA surveillance of Muhtorov, itself a product of the § 702 surveillance of Muhtorov, making the legality of its collection a relevant issue in Jumaev's case.

The unwarranted delays caused by the government that are described in the Muhtorov dissent—the delay in the provision of the § 702 notice, the delay in meaningful discovery production, and the failure to begin the CIPA § 4 evaluation until after November 19, 2015—are present in full measure in Jumaev's case, as are the delays resulting from the government's decisions not to clear counsel, its failure to adequately resource translation services, its seeking of a third superseding indictment in May 2016, and its chosen CIPA procedures. I weigh the government's conduct heavily against it under the second factor of Barker to conclude that Muhtorov's right to a speedy trial was violated.[2] See Muhtorov dissent, at 4-23. Perforce, the same conclusion that I drew with

---

[2] For Jumaev, my colleagues determine that "the first, second, and fourth Barker factors carry essentially the same weights here that they carry in Muhtorov." (Op. at 38.) In other words, for them, the length of the delay weighs heavily in favor of a constitutional violation and the prejudice arising from this delay weighs in Jumaev's favor, but the decisive second factor—the reason for the delay—weighs against him. (Op. at 38-39.) As I did in Muhtorov, I would also weigh the prejudice factor more heavily in Jumaev's favor. In evaluating this factor we must "recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Doggett v. United States, 505 U.S. 647, 655 (1992). This presumption of prejudice "cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria, [but] it is part of the mix of relevant facts, and its

respect to Muhtorov is applicable here.  Further, my colleagues in the majority conducted a rigid and formalistic Barker analysis and fault Jumaev for not filing a pro se speedy trial motion separate and apart from those filed by his counsel.

## II

Jumaev was incarcerated for six years as he awaited trial, hostage to the same series of inexplicable—or at least unexplained—government decisions I described in depth in the Muhtorov dissent.  See id.  Exacerbating the unwarranted delay described in the Muhtorov dissent, eleventh-hour discovery production by the government caused an additional year's delay in Jumaev's trial from March 2017 to March 2018[3] while he "languish[ed] in confinement under unresolved charges."  Betterman v. Montana, 136 S. Ct. 1609, 1614 (2016).  The context of Jumaev's motion for a speedy trial is telling.  In late February 2017, just two weeks before the scheduled trial date and after years of futilely filing motions to compel discovery, Jumaev sought dismissal of the charges because of the government's belated disclosure of a substantial portion of Brady and Rule 41 material that included 29 trial exhibits it produced for the first time shortly before trial.

---

importance increases with the length of delay."  Id. at 656 (citation omitted and emphasis added).

[3] Although the initial continuance granted after the district court denied Jumaev's requested remedy of dismissal was for ten months until January 2018, the trial was delayed for an additional two months until March 2018 due to the district court judge's illness.  But for the government-caused delay, the trial would have begun in March 2017, therefore I would attribute the entire additional year's delay to the government.  See United States v. Carini, 562 F.2d 144, 149 (2d Cir. 1977) (illnesses of judges are institutional delays properly chargeable to the government).  As the record makes clear, replacement of the trial judge during his treatment would have delayed the trial longer as the available replacement would have required time to become familiar with the case.

This late production of evidence—evidence that had been in the custody of the government since the time of Jumaev's arrest or before—made it impossible for his counsel to be prepared for the trial that was scheduled to begin on March 13, 2017. For Jumaev, this eve-of-trial production of constitutionally-required evidence necessitated dismissal for violation of a speedy trial because, as his counsel argued, counsel would be forced to provide ineffective assistance if the trial proceeded. His first speedy trial motion was filed to oppose the unwarranted additional delay staring Jumaev in the face— delay directly caused by the unexplained late production of evidence in the possession of the government for more than five years.[4] Jumaev, like Muhtorov, was not required to trade one constitutional right for another; the Constitution protects both. Muhtorov dissent, at 17-18. Because the governmental delays described in the Muhtorov dissent were exacerbated for Jumaev, whose scheduled trial was continued as a direct result of the government's eleventh-hour production of discovery material it long had in its possession, the second Barker factor weighs even more heavily in Jumaev's favor than it did for Muhtorov.

---

[4] Jumaev's March 2017 motion was filed only after his speedy trial motion was denied, a decision which the district court recognized forced his counsel to seek a continuance or go to trial and provide ineffective assistance. For Jumaev, the March 2017 speedy trial motion was filed to avoid the additional delay necessitated by the government's late production of discovery, including disclosure of trial exhibits on the eve of trial; it was not filed "after the delay has already occurred." (Op. at 26 (quotation omitted).) The record is clear that absent the government's late disclosures, Jumaev was ready to proceed to trial in March 2017. Late production of constitutionally required discovery by the government continued until the eve of the March 2018 trial. (See Op. at 14 n.6.) Counsel for Jumaev argued below that these late disclosures included unclassified evidence long in the possession of the government that was not required to be analyzed under CIPA.

**III**

The third Barker factor—assertion of the speedy trial right—similarly supports Jumaev's claim. The majority comes to the opposite conclusion because (1) Jumaev neither augmented his counseled motions with pro se filings nor (2) filed his speedy trial motions as early as did Muhtorov. The Barker analysis conducted by my colleagues is not faithful to the requirements of that case. Barker requires that its balancing test weigh "the conduct of both the prosecution and the defendant." 407 U.S. at 530. Rather than carrying out this ad hoc and contextual analysis, the majority instead conducts a highly rigid and formulistic evaluation of whether Jumaev asserted his right to a speedy trial. See id. at 522 ("[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case . . . .").

My research fails to disclose any cases or authorities that hold that a counseled defendant must file pro se motions for denial of a speedy trial separate and apart from those of his counsel. My colleagues fail to enlighten me further on that point. To the extent that the majority creates a new precedent for this circuit compelling defendants to file pro se motions separate and apart from those of their counsel in order to assert speedy trial rights or implies that such filings give greater weight to an assertion of the right to a speedy trial, I am compelled to separate myself from this jurisprudentially problematic proposition.

5

Although <u>Barker</u>'s third factor requires us to consider the two additional pro se

motions for a speedy trial filed by Muhtorov,[5] it is obvious that we cannot require

counseled defendants to file pro se motions in order for <u>Barker</u>'s assertion-of-the-right

factor to weigh in their favor.  To say it another way, although we must consider

Muhtorov's pro se motions when evaluating whether he asserted his speedy trial right, we

<u>cannot</u> penalize Jumaev in comparison.[6]  My colleagues so penalize Jumaev by faulting

him for not augmenting the motions filed by his counsel with pro se motions.  (Op. at 19-

20.)  The majority appears to tip this factor in favor of Muhtorov because his two pro se

motions expressed frustration with the delay.  Yet Jumaev did not accede happily to the

delays in bringing his case to trial.  The two speedy trial motions filed by his counsel,

which exhaustively detail his persistent and diligent efforts to access the discovery to

which he was constitutionally entitled and to move the case to trial, are equally

expressive of his frustration, and additional pro se motions were not necessary.

Although my colleagues acknowledge that Jumaev "objected to the slow pace of

the government's discovery efforts throughout the proceedings," (Op. at 22), they give

---

[5] Appellate review of Muhtorov's pro se motions is problematic because the motions were, permissibly, not accepted by the district court.  <u>See generally</u> <u>United States v. Dunbar</u>, 718 F.3d 1268, 1278 (10th Cir. 2013) ("Defendant ha[s] no right to submit motions other than through his attorney."); <u>United States v. Bennett</u>, 539 F.2d 45, 49 (10th Cir. 1976) ("[P]ermission for [hybrid representation is] recognized as being discretionary with the trial court.").

[6] Both Muhtorov and Jumaev filed two counseled motions for a speedy trial violation; the sole difference in the number of speedy trial motions are the two pro se motions filed by Muhtorov.  I conclude that both Muhtorov and Jumaev sufficiently asserted their right to a speedy trial, and disagree that this factor weighs against Jumaev.

6

him little credit for these efforts, and instead focus myopically on measuring the time

between the filing and the scheduled trial dates.[7]  This type of formulistic, truncated

---

[7] My colleagues in the majority fault Jumaev for joining Muhtorov's motion to suppress § 702-derived evidence.  They assert that Jumaev "knew that his chances of prevailing on the motion were close to zero," in part because the "government informed Jumaev two months before he joined Muhtorov's motion that he was not an 'aggrieved person' as to the Section 702 acquisitions at issue," and therefore, Jumaev's decision to join the motion demonstrates that he was not actually eager to go to trial.  (Op. at 22-23.) Problems abound with this analysis. First, the government's assertion that Jumaev was not an "aggrieved person" entitled to notice is an unsettled question of statutory interpretation that, although not presently contested in this appeal, was open to good faith challenge by Jumaev below.  Second, contrary to the majority's assertion, the belated government assurances that Jumaev was not an "aggrieved person" were far from unequivocal, requiring several defense motions to gain a clear articulation of the government's position.  Third, in accordance with the government's decision to try them jointly, Jumaev and Muhtorov remained as co-defendants in a single trial until the November 2016 severance.  Therefore, Jumaev's decision to join Muhtorov's second suppression motion in 2014 did not evidence Jumaev's lack of eagerness to go to trial because, regardless of whether he joined the motion, he could not progress toward trial until the motion was decided in November 2015, which was more than a year before severance.  Finally, as recognized by the district court, the government's interpretation that Jumaev was not an "aggrieved person" under the statute does not resolve the constitutional derivative evidence inquiry or his facial challenge to the constitutionality of § 702 surveillance.

The majority asserts that "the district court corroborated this claim [that Jumaev's chances of success on the motion to suppress were close to zero] . . . at a hearing that took place when the joint motion was pending."  (Op. at 22.)  In doing so, the majority once again ignores context—at this June 2015 hearing, the district court told the parties "what he was going to do, and what it means" in regard to the defendants' motion to suppress § 702 evidence.  Far from evidencing a foregone conclusion that Jumaev's "chances of prevailing on the motion were close to zero," id., it instead was a preliminary ruling on that very question.  Given that the evidence used against Jumaev was derived from § 702 surveillance, albeit one step removed from that of Muhtorov, Jumaev's decision to join in Muhtorov's motion to suppress evidence derived from § 702 surveillance was far from a bad faith attempt to delay the trial.  To the extent that additional delay resulted from this decision, which it did not given that the cases were not severed until a year after the motion to suppress was decided, it should not be weighed heavily against Jumaev.

analysis was rejected by the Supreme Court as "insensitive to a right which we have deemed fundamental." Barker, 407 U.S. at 529-30. Barker requires "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." Id. at 530. Our analysis must decide "whether the defendant's behavior during the course of litigation evidences a desire to go to trial with dispatch." United States v. Batie, 433 F.3d 1287, 1291 (10th Cir. 2006). When I weigh the conduct of both parties as required by Barker, I cannot conclude that Jumaev did not sufficiently assert his right to a speedy trial.

In the initial years of Jumaev's incarceration, the government repeatedly assured him that discovery would be forthcoming. In May 2012, it asserted that discovery would be provided in June 2012. When that did not ensue, in October 2012, the government asserted that the required discovery (which included the requested defendants' statements and Brady material) would be provided by June 2013. Very little was provided, with no discovery provided between September 2014 and April 2015. In March 2016, the government resisted defense efforts to compel discovery and a trial date. The defendants

---

My colleagues contend that Jumaev acknowledges that "the case against [him] had virtually nothing to do with FISA," cherry picking this purported admission from his reply brief. (Op. at 23 (citing Reply Br. at 13).) To the contrary, in his reply Jumaev was pointing out the contradiction in the government's simultaneous assertion that FISA and CIPA did not apply to him and its insistence that FISA and CIPA still limited its ability to comply with its discovery obligations. My colleagues further question my failure to explain why Jumaev could not have moved for severance earlier. (Op. at 23 n.9.) The more appropriate question is how he was to assess this decision without notice of the involvement of § 702 evidence in the case against him for more than 23 months, or any meaningful discovery until September 2016. His inability to evaluate this decision was caused by the government's obfuscation of the source of its evidence against him until after October 2013.

requested a discovery cut-off of July 1, 2016 to facilitate progress to trial, but the

government pushed the date back to September 1, 2016. The filing of the Third

Superseding Indictment by the government in May 2016 "mandated" an additional trial

delay. Finally, as discussed above, belated discovery following the court-imposed

discovery cut-off resulted in an additional year's delay in trial. Unlike Batie, Jumaev did

not seek continuances. He waited on the government to fulfill its responsibilities,

diligently and persistently filing discovery motions that were not met in a timely fashion.

If this is the conduct I am weighing, the balance easily comes down on Jumaev's side of

the scale.

The majority also ignores that, after severance, Jumaev was required to proceed to

trial first, before Muhtorov. Simply comparing the time between filing of their first

counseled speedy trial motions and Muhtorov and Jumaev's respective trial dates ignores

the shorter practical window between the November 29, 2016 severance and the first

scheduled trial date on March 13, 2017 available for Jumaev to assert his speedy trial

right. It similarly ignores that Jumaev's first motion to dismiss on speedy trial grounds

was not filed to take advantage of delay that had already occurred. (Op. at 25-27.)

Although significant, and in my mind unexplained, delay had already occurred, this

motion was instead filed because the government's continued discovery delays and late

production had necessitated another year's delay in addition to the years-long delay

already caused by the government. Jumaev's second motion to dismiss for a speedy trial

violation highlighted the late production of required discovery that continued throughout

this additional year of delay. The majority agrees that "discovery was not completed

9

until February 2018, making an earlier trial impossible." (Op. at 15 n.6.) Such continued late production of constitutionally required discovery raises significant questions about the readiness of the government to have gone to trial in March 2017, and failure to meet its discovery obligations does not show "necessity" for the delay under Seltzer.

My colleagues view the motions filed by Jumaev as not timely. (Op. at 19.) But Jumaev had been eager to proceed to trial in March 2017 before the government's eleventh-hour disclosure that required the additional delay in trial. Far from being untimely, Jumaev's motions represent the culmination of years of conduct seeking to proceed to trial. When I assess Jumaev's conduct during the course of the litigation, his persistent motions seeking the disclosure he had requested and was constitutionally due does not show a defendant "who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire." United States v. Tranakos, 911 F.2d 1422, 1429 (10th Cir. 1990). As a result, I would weigh Barker's third assertion-of-the-right factor heavily in Jumaev's favor.

## IV

For the reasons described herein and in the Muhtorov dissent, I weigh all four Barker factors heavily in favor of Jumaev and conclude his conviction must be vacated for want of a speedy trial. Any other result would "not [be] consistent with the interests of defendants, society, or the Constitution." Barker, 407 U.S. at 528.